# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE DUKE ENERGY CORPORATION DERIVATIVE LITIGATION | ) ) C.A. No. 7705-VCG ) |

## MEMORANDUM OPINION

Date Submitted: May 9, 2016
Date Decided: August 31, 2016

Ronald A. Brown, Jr. and Marcus E. Montejo, of PRICKETT JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: John W. Haley and Bruce J. McKee, of HARE WYNN NEWELL & NEWTON LLP, Birmingham, Alabama; Frank P. DiPrima of THE LAW OFFICE OF FRANK DiPRIMA, P.A., Morristown, New Jersey, *Attorneys for Plaintiff Richard A. Bernstein.*

Kenneth J. Nachbar, Susan W. Waesco, and Alexandra M. Cummings, of MORRIS, NICOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Jack B. Jacobs, of SIDLEY AUSTIN LLP, Wilmington, DE, *Attorneys for Defendants James E. Rogers, William Barnet, III, G. Alex Bernhardt, Sr., Michael G. Browning, Daniel R. DiMicco, John H. Forsgren, Ann Maynard Gray, James H. Hance, Jr., E. James Reinsch, James T. Rhodes, and Philip R. Sharp, and Nominal Defendant Duke Energy Corporation.*

GLASSCOCK, Vice Chancellor

In 2011, Duke Energy Corp. ("Duke" and prior to July 2, 2012, "Old Duke") entered a merger agreement with another electric utility company, Progress Energy, Inc. ("Progress"). Old Duke and Progress were both large regional utilities, with significant operations in North Carolina, among other states. Under the agreement, the successor company would also be known as Duke Energy Corp. (in context, "New Duke"). The initial board of directors of New Duke would be composed of eleven legacy Old Duke directors, and six legacy Progress directors. Important to this case is another negotiated provision of the agreement: the CEO of Progress, William Johnson, would serve as CEO of New Duke, and the CEO of Old Duke, James Rogers, would be appointed "executive chairman" of New Duke. This information was conveyed to stockholders of both entities in SEC filings. It was also communicated by Old Duke to the regulatory body overseeing Duke in North Carolina, the North Carolina Utilities Commission (the "NCUC"), in seeking NCUC's approval of the merger. The merger was conditioned on this approval. Consideration of the merger by the NCUC was stayed after a hearing, pending another required approval, that of the Federal Energy Regulatory Commission (the "FERC"). Pursuit of the regulatory approvals on which the merger was conditioned caused a substantial delay in its consummation, a period of eighteen months.

According to the complaint, during this eighteen-month period, the Old Duke board of directors had second thoughts about the agreement to name Johnson CEO

of New Duke. This put the Old Duke directors in a bind. They could renounce the merger agreement, or attempt to renegotiate it, both courses that could lead to breach of the agreement and loss of the merger, together with liability for a substantial break-up fee. They could simply comply contractually with the requirement to employ Johnson as CEO, but they had already decided that he was unfit for that position. Or they could technically comply with the agreement, appoint Johnson as CEO, then immediately use their numerical superiority on the New Duke board to fire and replace him. The complaint alleges that the Old Duke directors (the "Director Defendants") chose the latter path. They elected to make it appear that they were going to comply with the merger agreement, when in fact they had decided to fire Johnson immediately post-merger and replace him with Old Duke CEO Rogers. The "walk-away" date by which the merger must close was July 8, 2012. Shortly before that deadline, on June 27, 2012, the Defendants signed Johnson to a Duke CEO agreement, with a lucrative severance fee. Once the FERC agreed to the merger, Old Duke sought expedited approval from the NCUC, representing that nothing had changed from the initial hearing that would require further hearings before that body—thereby concealing from the NCUC (as well as Progress and the public) the decision to fire Johnson and replace him with Rogers. The NCUC approved the transaction, and the merger closed July 2, 2012.

Shortly thereafter, on the same day, the New Duke board met telephonically

3

and appointed Johnson CEO pursuant to the merger agreement and the June 27 CEO agreement. Then, at the request of Director Defendant Ann Gray, the board went into executive session. Johnson was requested to stay available to the board pending the outcome of the session. Gray, in the executive session, then told the legacy Progress directors of the New Duke board that she believed Johnson was "not a good fit" to serve as CEO, and should be fired. The legacy Progress directors were "shocked," and attempted to dissuade the Director Defendants from their decision to fire Johnson, to no avail. After a rather lengthy and one-sided discussion (except for Gray's statement that Johnson was a poor "fit," none of the Director Defendants spoke), the board voted to discharge Johnson and replace him with Old Duke CEO Rogers. The vote broke down entirely by legacy; all Director Defendants (legacy Old Duke) present voted to discharge Johnson, and all legacy Progress directors present voted against discharge. The executive session was then concluded. Gray immediately thereafter met with Johnson at Duke headquarters and notified him of the board's decision, a result entirely unexpected by him.[1] Rogers was installed as New Duke CEO.

According to the complaint, several bad results followed from the decision to fire Johnson and its concealment until after the merger. Among a number cited in

---

[1] As the complaint memorably puts it, "[e]ven Julius Caesar had more notice" before the shiv was slipped in. Pl's Am. Compl. (the "Complaint" or "Compl.") ¶ 10.

4

the complaint[2], two are particularly relevant: Johnson was entitled to a large severance package although he served as New Duke CEO only for a matter of minutes, and the NCUC, believing itself to have been misled by false representations by Old Duke concerning who would serve as New Duke CEO, took action against the company, resulting in damages.

Lawsuits by Old Duke stockholders followed, notably a North Carolina action, styled *Krieger v. Johnson*.[3] That matter involved a derivative claim: that the actions of the Director Defendants, in firing Johnson and incurring contractual liability thereby, constituted breaches of the duty of loyalty and waste. The *Krieger* court dismissed the action, finding that under controlling Delaware law, demand on the board was not excused. The Plaintiffs here also seek to sue derivatively, on behalf of Duke.

The matter is before me on a motion to dismiss. The Defendants allege the matter is barred by collateral estoppel. I find that the *Krieger* decision collaterally estops these plaintiffs, but only to the extent they seek to proceed on a claim for breach of fiduciary duty in connection with the damages and contractual obligations flowing from the firing of Johnson itself; under the *Krieger* decision, that is a matter

---

[2] The Plaintiffs allege that the NCUC commissioners stated that they had been misled and called public hearings. Securities fraud class actions have been filed against Duke. Standard & Poors Bond Rating Service ("S&P") put its rating for Duke on negative watch because of the "sudden shift in management," and subsequently, on July 25, 2012, downgraded Duke's debt. The Attorney General of North Carolina and the Florida Public Service Commission began investigations.
[3] 2014 WL 1759054 (N.C. Super. Ct. Apr. 30, 2014).

to which the board may apply its independent business judgement. *Krieger* does not address the primary cause of action that the Plaintiffs advance here, however: that the Old Duke board made up its mind to install Rogers rather than Johnson as CEO *prior* to the merger, but neglected to inform the public and, importantly, the NCUC of this determination, in violation of positive law. This action and inaction, according to the Plaintiffs, was undertaken in bad faith. I find that the Plaintiffs have pled specific facts that, if true, and together with the reasonable inferences therefrom, indicate that the Old Duke board's failure to correct its representations to the NCUC was intentional and in bad faith, sufficient to withstand a motion to dismiss under Rule 23.1, and that these allegations are not barred by collateral estoppel.

To decide who will serve as chief executive of a corporation is a quintessential board function. Once the Old Duke board realized that they had improvidently bound the company contractually to employ a CEO they found unfit, there were surely several courses—each no doubt problematic—available to them, within their business judgement, to remedy the situation. They could choose among them. What they could not do, consistent with their duty of loyalty to Duke, was what the complaint alleges they did here: choose a path that caused Duke to violate positive law.

This Complaint raises other arguments that may be subsumed under my

analysis here. Rather than apply my findings below to the many allegations of the Complaint, I find it most efficient to have the parties notify me as to which causes of action and requests for relief remain in light of my decision here, and to what extent further review under Rules 12(b)(6) and 23.1 is warranted.

# I. BACKGROUND[4]

*A. The Parties*

Plaintiffs Lesley C. Rupp and Richard A. Bernstein are representative stockholders of Duke Energy Corporation.[5] They both have held shares continuously at all times relevant to liability.[6]

Nominal Defendant Duke is a large utility company, incorporated in Delaware and headquartered in North Carolina.[7] Common shares of Duke trade on the New York Stock Exchange ("NYSE") under the symbol "DUK."[8] Duke is in the business of "generating, transmitting, distributing and selling electrical power, both through nuclear and coal-fired plants, and selling the power primarily for commercial and residential consumption in [Duke's] regulated service areas."[9] Pre-merger, Old Duke's primary service areas included central and western North Carolina, western

---

[4] The facts are drawn from the well-pled allegations of Plaintiff's Complaint and documents incorporated by reference therein, and are presumed true for purposes of evaluating Defendants' motion to dismiss.

[5] Compl. ¶¶ 1, 14.

[6] *Id.* at ¶ 14.

[7] *Id.* at ¶¶ 2, 13.

[8] *Id.* at ¶ 13.

[9] *Id.*

South Carolina, central and southern Indiana, and northern Kentucky.[10] Old Duke served over four million customers, and 12 million people, covering 50,000 square miles.[11] In 2011, it achieved operating revenues of $14.6 billion and net income of $1.7 billion across its three reporting business segments.[12]

Pre-merger, Progress was another large utility company, incorporated and headquartered in North Carolina, and primarily serving customers in North Carolina, South Carolina, and Florida.[13] In 2011, Progress achieved operating revenues of $8.9 billion and net income of $582 million.[14] Following the merger, Progress is now a wholly owned subsidiary of Duke, and Duke is the nation's largest utilities company in terms of both revenues and power-generation capacity, with 45% of its rate-regulated revenues coming from customers in North Carolina.[15]

Defendants James E. Rogers, William Barnet, III, G. Alex Bernhardt, Sr., Michael G. Browning, Daniel R. DiMicco, John H. Forsgren, Ann Maynard Gray, James H. Hance, Jr., E. James Reinsch, James T. Rhodes, and Philip R. Sharp collectively are referred to as the "Director Defendants." Rogers is a director of Duke, which position he has held continuously since Duke's merger with Cinergy

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* at ¶¶ 2, 13.
[14] *Id.* at ¶ 13.
[15] *Id.*

Corporation in 2006, and has served as Chairman of the Duke board since 2007.[16] Rogers also served as CEO of Duke from 2006 through the filing of this action, except for the evening of July 2, 2012, as discussed further below.[17] Barnet is President and CEO of Barnet Development Corporation, a real estate development firm, and has served as a director of Duke since 2005.[18] Bernhardt is Chairman and past CEO of Bernhardt Furniture Company, and has served as a director of Duke since 1991.[19] Browning is Chairman and President of Browning Investments, a real estate development company, and has served as a director of Duke since 1990.[20] DiMicco is Chairman and CEO of Nucor Corporation, a manufacturer of steel and steel products, and has served as a director Duke since 2007.[21] Forsgren is the former Executive Vice President and Chief Financial Officer ("CFO") of Northeast Utilities, and has served as a director of Duke since 2009.[22] Gray is the former President of Diversified Publishing Group, and has served as a director of Duke since 1997, and the "Lead Director" since 2004.[23] Hance is the former CFO of Bank of America Corp., and has served as a director of Duke since 2006.[24] Reinsch is the

---

[16] *Id.* at ¶ 15.
[17] *Id.*
[18] *Id.* at ¶ 16.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*

former Senior Vice President and Partner of Bechtel Group and past President of Bechtel Nuclear, and has served as a director of Duke since 2009.[25] Rhodes is the former Chairman and CEO of the Institute for Nuclear Power and CEO of Virginia Electric and Power Company, and has served as a director of Duke since 2001.[26] Finally, Sharp is the President of Resources for the Future, a non-profit organization that conducts research into energy, environmental issues, and resource economics; a former Indiana Congressman; and has served as a director of Duke since 2007.[27] In other words, the Director Defendants were each directors at all times pertinent to liability, and remained so through the filing of the complaint.

### B. Significant Non-Parties

William D. Johnson served as President of Progress from 2005 until his promotion to Chairman and CEO in 2007.[28] Prior to holding these roles, he served in a variety of top management positions at Progress, including roles as General Counsel, Executive Vice President, Corporate Secretary, and president of Progress's core business units.[29] Pursuant to the merger, Johnson was appointed CEO and a member of the Duke board, which positions he held for only a few hours on July 2,

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.* at ¶ 18.
[29] *Id.*

2012.[30]

John H. Mullin III was a pre-merger member of the Progress board of directors, who served from 1999 until July 2, 2012.[31] He acted as Progress's lead director at all times, pre-merger, relevant to liability.[32]

John D. Baker II, Harris E. DeLoach, Jr., James B. Hayler, E. Marie McKee, Carlos A. Saladrigas, and Theresa M. Stone collectively are the legacy Progress directors. Baker and Stone served on the Progress board beginning in 2009 and 2005, respectively, and both joined the New Duke board pursuant to the merger and subsequently resigned on July 27, 2012, in protest of the events complained of in this action.[33] DeLoach, Hyler, McKee, and Saladrigas were pre-merger members of the Progress board—who began serving in 2006, 2008, 1999, and 2001, respectively—who now serve on the New Duke board.[34]

The New Duke board, as of the date this action commenced, consisted of 15 members: the 11 Director Defendants and the four of six legacy Progress directors who did not resign in July 2012.[35]

---

[30] *Id.* at ¶¶ 3, 18. As discussed *infra*, on July 2, 2012, Johnson resigned from his position as CEO and a Duke director. *Id.* at ¶ 20.

[31] *Id.* at ¶ 19.

[32] *Id.*

[33] *Id.* at ¶ 20.

[34] *Id.* I take judicial notice of the publicly available press release announcing the appointment of Saladrigas as a Progress director in 2001, available at https://www.progress-energy.com/company /media-room/news-archive/press-release.page?title=Carlos+Saladrigas+elected+to+Progress +Energy+Board+of+Directors&pubdate=08-20-2001.

[35] *Id.* at ¶ 22.

11

*C. Factual Overview*

### 1. Events Leading Up to the Merger

In June 2010, the Old Duke board authorized management to explore a possible merger with Progress.[36]  Rogers, CEO of Old Duke, and Johnson, CEO of Progress, met to discuss strategic aspects of the proposed merger on July 18, 2010.[37] At that initial meeting, Rogers told Johnson that Old Duke was receptive, post-merger, to a greater emphasis on the regulated-utilities business and to Johnson becoming CEO.[38]  Mullin, Progress's lead director, authorized Johnson to meet with the Old Duke board to advance discussions on the merger.[39]  On July 19, 2010, Johnson ceased negotiations on behalf of Progress with a third party concerning an alternative deal.[40]  Progress and Old Duke signed a non-disclosure agreement with an 18-month standstill provision on July 29, 2010.[41]

Johnson met separately with groups of Old Duke directors on July 29 and August 2, 2010, as "an opportunity for the directors to get to know Mr. Johnson."[42] Around the same time, the two companies began exchanging financial information.[43]

---

[36] *Id.* at ¶ 26.
[37] *Id.* at ¶ 30.
[38] *Id.*
[39] *Id.*
[40] *Id.* at ¶ 31.
[41] *Id.* at ¶ 32.
[42] *Id.* at ¶ 33 (quoting Duke Energy Co., Registration Statement (Form S–4), Am. No. 5 (July 7, 2011)) (emphasis omitted).
[43] *Id.* at ¶ 34.

12

Negotiations, diligence, and meetings between the CEOs continued through December 2010.[44] On October 2, 2010, Rogers and Johnson met to discuss proposed terms of the deal, including that Johnson would serve as CEO of the post-merger company.[45] They met again on November 15, 2010, along with the two lead directors of the companies, to discuss strategy and management design of the new company.[46] On December 18, 2010, Rogers and Johnson met to discuss a revised term sheet, including the roles of Rogers and Johnson post-merger and the composition of the New Duke board, which was to include 11 Old Duke designees (including Rogers) and seven Progress designees (including Johnson).[47]

2. Certain Material Provisions of the Merger Agreement

The boards of both companies unanimously approved the merger on January 8, 2011.[48] The companies executed the merger agreement and announced the merger on January 10, 2011.[49]

Pursuant to the merger agreement, each share of Progress stock was to be converted into a right to receive 2.615 shares of Duke common stock, before giving

---

[44] *Id.* at ¶¶ 36–40.
[45] *Id.* at ¶ 37.
[46] *Id.* at ¶ 38.
[47] *Id.* at ¶ 40.
[48] *Id.* at ¶ 41.
[49] *Id.*

effect to a Duke one-for-three reverse stock split.[50]  The merger was subject to approval by the stockholders of both companies and certain regulatory authorities, including, among others, the Federal Energy Regulatory Commission ("FERC"), the North Carolina Utilities Commission ("NCUC"), and the South Carolina Public Service Commission ("SCPSC").[51]  Johnson was to become the New Duke CEO and Rogers its Executive Chairman, and headquarters were to be located in Charlotte, North Carolina, while maintaining a significant presence in Raleigh.[52]

The merger agreement included a condition precedent to close that none of the regulatory approvals would require either party to conduct its business in a way that, or to agree to an order or condition that, would have a material adverse effect on that party's expected benefits from the merger.[53]  The merger agreement also included a walk-away date of January 8, 2012, with a possible six-month extension to accommodate pending regulatory approvals,[54] and a termination fee.[55]

### 3.  Events Following Execution of the Merger Agreement

Following execution of the merger agreement, Duke and Progress formed an "Integration Team," headed by Johnson and Rogers, to facilitate the combination of

---

[50] *Id.* at ¶ 42.  This represented a premium of approximately 7.1% over the closing price of Progress common stock on January 5, 2011, and total consideration for Progress stockholders of approximately $13.7 billion.  *Id.*
[51] *Id.* at ¶¶ 43, 46.
[52] *Id.* at ¶¶ 44–45.
[53] *Id.* at ¶ 47.
[54] *Id.* at ¶ 48.
[55] *Id.* at ¶ 49.

the two companies.[56]  Progress's Chief Integration and Innovation Officer, Paula Sims, played a large role on this team.[57]

The companies filed an application with the NCUC to approve the merger on April 4, 2011, later filing in support thereof written testimony of Johnson and Rogers.[58]  On September 20, 2011, Johnson and Rogers appeared before an NCUC panel to testify.[59]  In all three of these interactions with the NCUC, the companies represented that Johnson would be CEO of post-merger Duke; they testified on September 20, 2011, for example, that "Johnson would lead the New Duke Energy," and "would set the tone for the direction . . . that the new company is going to take."[60]  The NCUC hearings closed on September 22, 2011, and the NCUC withheld final approval pending FERC approval.[61]  Stockholders of both companies approved the merger at separate meetings on August 23, 2011.[62]

On September 30, 2011 FERC conditionally approved the merger, subject to both companies filing a mitigation plan that would reduce the new company's combined market power and include the formation of a regional transmission organization to help coordinate the transmission of electricity, the sale of Duke

---

[56] *Id.* at ¶ 52.
[57] *Id.*
[58] *Id.* at ¶¶ 53–54.
[59] *Id.* at ¶ 54.
[60] *Id.*
[61] *Id.*
[62] *Id.* at ¶ 56 (citing Duke Energy Co., Registration Statement (Form S–4), Am. No. 5 (July 7, 2011)).

power plants, the transfer of rights to generated electricity, and the construction of new transmission lines.[63] FERC's approval of the merger was subject to its approval of this mitigation plan.[64] The companies filed a mitigation plan with FERC on October 17, 2011 (the "First Mitigation Plan").[65] FERC rejected the First Mitigation Plan on December 14, 2011, but gave the companies the opportunity to file a new plan.[66] The Defendants, according to the Plaintiffs, thereafter soured on the merger and tried to get out of it without paying a termination fee.[67] Progress retained litigation counsel to enforce the merger agreement, if needed.[68] Johnson, meanwhile, kept soliciting regulatory approvals in anticipation of the fast-approaching July 8, 2012 walk-away date.[69] The Defendants knew the status of each required regulatory approval, as they were widely reported in the trade press, the daily press, on the Internet, and in an SEC Form 8-K filed on the day of each approval, conditional approval, or rejection of each regulatory body.[70]

The companies filed a second mitigation plan on March 26, 2012 (the "Second Mitigation Plan") and, expecting favorable FERC action, filed with the NCUC on May 8, 2012 a supplemental stipulation to reopen hearings on an emergency basis,

---

[63] *Id.* at ¶ 57.
[64] *Id.*
[65] *Id.* at ¶ 58.
[66] *Id.* at ¶¶ 59–60.
[67] *Id.* at ¶ 60.
[68] *Id.* at ¶ 62.
[69] *Id.* at ¶¶ 61–62.
[70] *Id.* at ¶ 66.

16

advising NCUC that the two companies wanted to close the merger by July 1, 2012.[71]

FERC approved the Second Mitigation Plan on June 8, 2012, subject to certain conditions that required no further FERC action, and the parties informed NCUC of this progress.[72] On June 13, 2012, the NCUC Public Staff (the consumer-advocate arm of the NCUC) agreed not to oppose the companies' stipulation on how they planned to comply with the FERC order;[73] however, another advocacy group, "NC-WARN," opposed final NCUC approval and demanded the opportunity to cross-examine Duke, Progress, and NCUC Public Staff witnesses.[74]

On June 25, 2012, the companies again represented to the NCUC that its approval was an emergency because of the impending walk-away date; based upon this representation, the NCUC reopened the hearings that same day.[75] Duke represented to the Commission that "there were no changes justifying reopening the hearings."[76] The NCUC proceeded with the hearings to give NC-WARN an opportunity to object.[77] On June 29, 2012, the NCUC issued its final order, approving the merger.[78] The SCPSC, which had withheld approval awaiting NCUC

---

[71] *Id.* at ¶¶ 63–64.
[72] *Id.* at ¶ 65.
[73] *Id.* at ¶ 68.
[74] *Id.* at ¶ 69.
[75] *Id.* at ¶ 70.
[76] *Id.*
[77] *Id.* at ¶ 71.
[78] *Id.* at ¶ 72.

final action, gave its approval of the merger at noon on July 2, 2012.[79]  The merger

closed at 4:02 pm that day (the "Closing"), right after the close of financial markets.[80]

### 4. Johnson to Become CEO of Duke

Declarations of both companies—including press releases, petitions to the

NCUC and other regulators to approve the merger, testimony to the NCUC,

Securities & Exchange Commission ("SEC") filings, proxies soliciting stockholder

approval, and the merger agreement—all stated that, following consummation of the

merger, Johnson, CEO of Progress, would become CEO of New Duke, and Rogers,

CEO of Old Duke, would become its Executive Chairman.[81]  This arrangement,

according to Plaintiffs, aligned with the companies' stated strategy to "concentrate

on the regulated delivery of power to consumers, where [Progress] was strongest,

rather than energy trading, a [Duke] specialty."[82]  The merger agreement explicitly

stated that Johnson was to lead implementation of that strategy.[83]  An SEC Form S-

4, filed July 7, 2011, stated that the companies "viewed having Mr. Johnson as the

chief executive officer of the combined company as an important element in

ensuring implementation of [the] strategy" of the combined company: to place

---

[79] *Id.* at ¶¶ 73–74.
[80] *Id.* at ¶ 74.
[81] *Id.* at ¶ 3.
[82] *Id.*
[83] *Id.*

"strategic emphasis on the regulated utility business."[84]  The Plaintiffs contend that this evinces that Director Defendants "plainly <u>knew</u> that to [Progress], Johnson becoming CEO was a material term of the Merger Agreement."[85]

### 5. The Night of the Closing

At the time of the Closing, Rogers and Johnson were together in Charlotte at Duke's headquarters.[86]  Just before 4:20 pm, Rogers informed Johnson that they needed to call into a telephonic board meeting, and at 4:30 pm the newly constituted New Duke board convened its first meeting, by telephone.[87]  Over the next 20 minutes, the board passed various resolutions, including the election of Johnson as CEO and of Rogers as Executive Chairman.[88]  At 4:50, Gray announced that the board was going into executive session, and Rogers and Johnson left the call.[89]  Three minutes later, Johnson received an email from Gray asking that he wait for her before returning to his home in Raleigh.[90]

Reading from a prepared script, Gray introduced a motion to remove Johnson and to re-install Rogers as CEO.[91]  No written notice, information packets, or board

---

[84] *Id.* at ¶ 35 (citing Duke Energy Co., Registration Statement (Form S–4), Am. No. 5 (July 7, 2011)).
[85] Pls' Answering Br. 24 (citing Compl. ¶ 35).
[86] Compl. ¶ 92.
[87] *Id.* at ¶¶ 93–94.
[88] *Id.* at ¶ 95.
[89] *Id.*
[90] *Id.* at ¶¶ 95–96.
[91] *Id.* at ¶ 97.

books were distributed in advance of or at the meeting to advise of the proposed CEO switch.[92] Gray asked for discussion.[93] In the discussion that ensued, none of the Director Defendants spoke at all, until each eventually voted.[94] The legacy Progress directors, stunned by the proposal, tried to persuade the legacy Old Duke directors from voting out Johnson.[95] Gray, when asked by them to explain her reasons, only cited Johnson's "style" and kept repeating that Johnson was not a good fit to lead the combined company.[96] After roughly an hour, one of the legacy Progress directors called for a vote; the ten legacy Duke directors voted in favor of Gray's motion, and each of the five legacy Progress directors in attendance voted against.[97]

Within the hour, Gray went to Duke headquarters with a lawyer and notified Johnson of the decision.[98] She asked for his resignation, advising him that he was still entitled to his severance package, and requested a decision by 7:00 am the following morning.[99] Johnson flew back to Raleigh, then resigned as CEO and director of Duke effective 12:01 am on July 3, 2012.[100] At 7:00 am, Duke announced

---

[92] *Id.*
[93] *Id.*
[94] *Id.* at ¶¶ 98, 122.
[95] *Id.* at ¶ 99.
[96] *Id.* at ¶¶ 99, 122.
[97] *Id.* at ¶¶ 99, 101. One legacy Progress director, Baker, was out of the country and unable to dial in for the board meeting. *Id.* at ¶ 95.
[98] *Id.* at ¶ 102.
[99] *Id.*
[100] *Id.*

in a press release and Form 8-K that Duke had completed the merger and that Rogers had been re-installed as CEO.[101]

### 6. Duke Directors Decision to Terminate Johnson

Prior to Closing, none of the Director Defendants had ever expressed concern to anyone at Progress about Johnson's management style, Progress's financial results, or whether Johnson was the right person to lead post-merger Duke.[102] The Plaintiffs allege that, starting in May 2012, the Defendants planned to fire Johnson upon completion of the merger, without allowing the input of the legacy Progress directors.[103] They also allege that the Defendants knew that they had represented to regulators, including the NCUC, that Johnson would be CEO.[104] The Plaintiffs allege that by failing to inform the regulators that they had changed their mind about the CEO position, a term the merger agreement deemed material, they were "materially misleading" those bodies.[105]

In support of the allegations that the decision to terminate Johnson was reached in May 2012, the Plaintiffs point to a series of actions taken by the Defendants.[106] On May 3, 2012, the Old Duke board went into executive session to discuss the possibility of removing Johnson as CEO of the post-merger New

---

[101] *Id.*
[102] *Id.* at ¶ 76.
[103] *Id.* at ¶ 77.
[104] *Id.* at ¶ 78.
[105] *Id.* at ¶¶ 79–80.
[106] *Id.* at ¶¶ 81–85.

21

Duke.[107]   Between May 3 and May 17, 2012, Gray discussed the possibility of Johnson's removal with each Defendant.[108]   Between May 3, and May 21, 2012, Gray engaged outside counsel and a communications firm, and chaired a Board Governance Committee meeting, for the purpose of orchestrating the CEO switch.[109] On May 30, 2012, the Defendants, again in executive session, further discussed a CEO switch, deciding not to discuss the matter with the Progress board and to defer Johnson's removal.[110]   Gray had further discussions with each of the Defendants in mid-June regarding Johnson's removal as CEO.[111]   Rogers was advised by Gray on June 23, 2012, and Browning on June 24, 2012, that the Old Duke board had concluded Johnson was not the best person to lead post-merger New Duke, and they asked Rogers if he would accept the position of CEO if asked; Rogers said "yes."[112]

The Plaintiffs contend that Defendants' failure to notify the regulatory agencies of the planned CEO switch constituted a violation of North Carolina law, which prohibits giving false information or "willfully withhold[ing] clearly specified and reasonably obtainable information" from the NCUC.[113]   In support of this accusation, the Plaintiffs point to Rogers's admission that the issue of what would

---

[107] *Id.* at ¶ 81.
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.* at ¶ 84.
[113] *Id.* at ¶ 86 (citing N.C.G.S.A. § 62-326).

be the regulators reaction a CEO switch came up in the Old Duke board's discussion of Johnson's removal.[114] The Defendants, according to the Plaintiffs, also concealed their intentions from the investing public by releasing on June 29, 2012 a press statement and filing an 8-K with the SEC, omitting the planned CEO switch.[115]

### 7. Regulators' Reactions to the Change in CEO

Following the CEO change, three top legacy Progress executives resigned in protest, including Paula Sims, who was to have played a key role on the Integration Team.[116] Standard & Poors Bond Rating Service ("S&P") placed Duke's debt on "watch for a possible downgrade" because of the "abrupt change in executive leadership," and negatively changed its outlook on a possible upgrade of Progress debt based on the "sudden shift in management."[117] On July 25, 2012, S&P lowered Duke's credit rating from A- to BBB+ with a negative outlook, based on heightened regulatory risk.[118]

The NCUC began a highly publicized investigation into Duke on July 6, 2012, requiring testimony from several key players, including Rogers, Gray, Johnson, McKee, and Hyler.[119] The North Carolina Attorney General also commenced an

---

[114] *Id.* at ¶ 88.
[115] *Id.* at ¶ 87.
[116] *Id.* at ¶ 111.
[117] *Id.* at ¶ 113.
[118] *Id.* at ¶ 120.
[119] *Id.* at ¶ 114.

investigation.[120]   In his testimony before the NCUC, Rogers revealed that the question of what would be the reaction of regulators to the CEO switch had come up in discussion among the Old Duke board members prior to the Closing.[121]

Gray, in her testimony before the NCUC, gave additional reasons for her motion to remove Johnson as CEO, beyond the sole reason recited before the July 2, 2012 vote, that is, that Johnson was not a "good fit" to run the combined company.[122] The first additional reason for removing Johnson was his handling of repairs and an insurance claim related to Progress's Crystal River 3 nuclear facility in Florida.[123] The Plaintiffs point to differing testimony from Gray and Rogers regarding the problem Duke had with Crystal River 3.[124]   Rogers testified that Johnson was spending Progress funds on repairing the plant, which compromised Duke's ability to make a "repair versus retire" decision.[125]   Gray testified that the problem was that the repair itself was behind schedule in getting back to power production, and that Johnson was slow to act regarding an insurance claim for the facility.[126]   Gray's second stated reason for moving to remove Johnson as New Duke CEO was the condition of the rest of Progress's nuclear fleet, other than the Crystal River 3

---

[120] *Id.*
[121] *Id.* at ¶ 116.
[122] *Id.* at ¶¶ 99, 122.
[123] *Id.* at ¶ 105.
[124] *Id.*
[125] *Id.*
[126] *Id.*

facility.[127] The final reason was Progress's financial results, which were slightly below the projections they had previously provided to Duke.[128] The Plaintiffs contend that these additional reasons are merely "pretexts" that are "made up now as self-justification for [the Defendants'] wrongdoing."[129] On July 27, 2012, legacy Progress directors Baker and Stone resigned in protest over the actions of the Director Defendants on the evening of the Closing.[130] Stone, in her resignation letter, expressed her view that the decision by the Director Defendants to remove Johnson as CEO was premeditated.[131]

### D. Procedural History of this Action

The Plaintiffs filed their initial complaint on July 17, 2012 and an amended complaint (the "Complaint") on July 30, 2012. In Count One of their Complaint, the Plaintiffs allege that the Director Defendants breached their fiduciary duties of loyalty and care through a series of acts: conspiring to breach the merger agreement, and concealing that planned breach, until consummation of the merger; knowingly permitting the Company to conceal its planned switch in CEO from Progress and the NCUC and other governmental and regulatory bodies; knowingly violating the laws of North Carolina and other laws; and "failing, through fear, sloth, cronyism,

---

[127] *Id.* at ¶ 106.
[128] *Id.* at ¶ 107.
[129] *Id.* at ¶ 104.
[130] *Id.* at ¶ 121
[131] *Id.* at ¶ 122.

misplaced collegiality, or other insupportable motives, to resolve at an earlier date, any issues or misgivings that they had with Johnson's prospective leadership."[132]

In Count Two, the Plaintiffs allege that the Director Defendants breached their fiduciary duties of loyalty and care through the following acts: knowingly disregarding those fiduciary duties by shutting off input from the legacy Progress directors regarding Johnson; knowingly breaching the merger agreement in furtherance of the conspiracy pled in Count One; knowingly violating representations made to Duke stockholders and the NCUC and other regulatory bodies; knowingly and recklessly jeopardizing Duke's standing and reputation with credit agencies, the NCUC, and other regulatory bodies; knowingly incurring liability for severance pay; and "recklessly incurring public opprobrium, injuring the public reputation of [Duke] and subjecting it to public ridicule."[133]

As of the date the Complaint was filed, the New Duke board consisted of 17 members, 11 of which are named as defendants in this action. Accordingly, the Plaintiffs allege that a pre-suit demand on the board would have been futile.

On August 13, 2012, Defendants filed a motion to dismiss the Complaint. Before briefing commenced, the Plaintiffs engaged in a leadership contest with the plaintiffs of several other derivative suits filed in Delaware based on the same core

---

[132] *Id.* at ¶ 133.
[133] *Id.* at ¶ 136.

set of facts. Ultimately, the Court appointed Bernstein as sole lead plaintiff by order entered August 12, 2013.

On December 23, 2013, the Court stayed this action pending resolution of a factually related consolidated federal securities suit (the "*Nieman* Action")[134] before the United States District Court for the Western District of North Carolina. On November 6, 2015, following resolution of the *Nieman* Action,[135] the Court entered an order lifting the stay and governing briefing on Defendants' motion to dismiss. The case was reassigned to me on March 9, 2016, due to Vice Chancellor Noble's retirement, and I heard oral argument on May 9, 2016. This Memorandum Opinion addresses Defendants' motion.

*E. Actions in Other Courts*

Derivative suits concerning the same core set of facts were also filed in other jurisdictions: (1) the *Neiman* Action, described above; (2) two suits in U.S. District Court, Delaware District, consolidated as *Tansey v. Rogers*, C.A. No. 12-1049-RGA (the "*Tansey* Action");[136] and (3) one suit in North Carolina state court (the "*Krieger* Action").

Joel Krieger, a Duke stockholder, filed the *Krieger* Action in the Superior

---

[134] *Nieman v. Duke Energy Corp.*, Civ. Docket No. 312-cv-00456-MOC-DSC (W.D.N.C.)

[135] The *Nieman* Action settled and was resolved by order entered on November 2, 2015. Duke paid $146 to the stockholder class pursuant to the settlement agreement.

[136] The proceedings in the *Tansey* Action were also stayed pending resolution of the *Nieman* Action.

Court of North Carolina on July 20, 2012. The case was designated to the North Carolina Business Court, a specialized forum for complex commercial and corporate litigation. In that action, Krieger alleged breaches of the fiduciary duties of loyalty and good faith and corporate waste by the ten Director Defendants, unjust enrichment by Johnson, and aiding and abetting breaches of fiduciary duty by Rogers.[137] As in this action, Krieger did not make a demand on the board. Instead he alleged that a majority of the board was incapable of "disinterestedly and independently considering a demand" because the director defendants faced a substantial likelihood of personal liability "for breaching their fiduciary duties and wasting corporate assets by terminating Johnson and paying him a $44 million severance package," and because the facts raised a "reasonable doubt" as to whether the decision was a valid exercise of business judgment.[138]

The *Krieger* defendants moved to dismiss the complaint for failure to make a demand and failure to state a claim.[139] The *Krieger* court issued an opinion in April 2014, applying Delaware law, granting the defendants' motion to dismiss, holding that "[p]laintiff's failure to make a presuit demand relative to any derivative claims in [*Krieger*] was not excused."[140]

---

[137] *Krieger*, 2014 WL 1759054, at *1.
[138] Defs' Opening Br., Transmittal Aff. of Susan Waesco, Esq., Ex. D (*Krieger* complaint) ¶ 62.
[139] *Krieger*, 2014 WL 1759054, at *3.
[140] *Id.* at *8

The court closely analyzed Krieger's demand futility arguments under Delaware law. The basis for Krieger's argument that the director defendants were interested or lacked independence due to a substantial likelihood of personal liability, was the amount and timing of the severance payment made to Johnson.[141] The court found that it could not "conclude that the amount of Johnson's severance and its timing give rise to a substantial likelihood of director liability."[142] The basis for the argument that the director defendants' actions were not a valid exercise of business judgment was "that the decision by the Director Defendants to approve the severance payments to Johnson could not have been the product of a valid exercise of business judgment because those payments amount to corporate waste."[143] After discussing Delaware's standard for waste, the court found that conclusory allegations that Duke received nothing of value from Johnson were insufficient, especially in light of the fact that the severance provided for "(a) a release of claims against Duke; (b) an agreement to cooperate with Duke in respect to transition matters and (c) non-competition, non-solicitation, non-disparagement and confidentiality covenants."[144] The court found it could not conclude "that what Duke received in consideration for the severance payments to Johnson was so inadequate

---

[141] *See id.* at *5.

[142] *Id.*

[143] *Id.* at *7. "Thus, according to Plaintiff, reasonable doubt as to whether the severance payments to Johnson were the product of a valid exercise of business judgment may be raised by its allegations that those payments amounted to waste." *Id.*

[144] *Id.* at *7–8.

that no person of ordinary, sound business judgment would deem it worth the amount paid."[145]  Finally, the court found that "in the context of the [*Krieger*] action, Plaintiff's *allegations of waste* do not provide sufficient basis to doubt that the action was taken honestly and in good faith."[146]

## II. ANALYSIS

The Defendants move to dismiss the Complaint pursuant to Court of Chancery Rules 23.1 and 12(b)(6).  The Defendants first argue that the Plaintiffs are collaterally estopped from relitigating the demand-futility issue, as it was previously determined against the plaintiff in the *Krieger* Action, who stands in privity with the Plaintiffs here.  As a result, according to the Defendants, I must find that the Plaintiffs lack standing here and dismiss.  Because it is potentially dispositive, I consider this collateral estoppel argument first.

### A. Collateral Estoppel and the Krieger Action

The preclusive effect of an earlier judgment is determined by the law of the forum in which the judgment was entered.[147]  Accordingly, because the *Krieger* Action was adjudicated in North Carolina, the Court must apply that state's law to determine the preclusive effect of the dismissal order in that case.

---

[145] *Id.* at *8.
[146] *Id.* (emphasis added).
[147] *Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612, 617 (Del. 2013).

Under North Carolina law, "the determination of an issue in a prior judicial or administrative proceeding precludes the relitigation of that issue in a later action, provided the party against whom the estoppel is asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding."[148] "Like *res judicata*, collateral estoppel only applies if the prior action involved the same parties or those in privity with the parties and the same issues."[149]

Here, the Plaintiffs, like the plaintiff in the *Krieger* Action, seek to sue derivatively on behalf of Duke, a right adjunct to their status as common stockholders of Duke. They purport to act for the corporation of which they are part owners, and their interests in recovery on behalf of that corporation, which would indirectly inure to their benefit as stockholders, are identical. The Defendants concede that the issue of privity among common stockholders bringing separate derivative claims has not been decided in North Carolina,[150] but point out that the courts of that state find that "[p]rivity exists where one party is so identified in interest with another that [it] represents the same legal right [as the other]."[151] The Defendants argue, and I agree, that application of such a policy necessarily would lead to a finding of privity between the Plaintiffs here and the plaintiff in the *Krieger*

---

[148] *Whitacre P'ship v. Biosignia, Inc.*, 591 S.E.2d 870, 880 (N.C. Ct. App. 2004).
[149] *Cline v. McCullen*, 557 S.E.2d 588, 590 (N.C. Ct. App. 2001).
[150] Defs' Opening Br. 19.
[151] *Id.* at 20. (citing *Brower v. Killens*, 472 S.E.2d 33, 35 (N.C. Ct. App. 1996) (internal quotation marks omitted); *see generally State v. Summers*, 528 S.E.2d 17 (N.C. 2000) (discussing theory of privity in context of issue preclusion).

31

Action. Such a finding would be consistent with the case law from numerous jurisdictions that have addressed the issue.[152] Having found privity, I apply the North Carolina analysis of collateral estoppel.

Under North Carolina law, issue preclusion only obtains where the issues presented are common in both actions. This "identity of issues" requires that:

> (1) [t]he issues to be concluded [are] the same as those involved in the prior action; (2) in the prior action, the issues [were] raised and actually litigated; (3) the issues must have been material and relevant to the disposition of the prior action; and (4) the determination made of those issues in the prior action [was] necessary and essential to the resulting judgment.[153]

If any of the four prongs are not satisfied, collateral estoppel does not apply. Here, the Defendants argue that the issue of whether demand was futile with respect to the allegations of wrongdoing in the instant complaint was presented to the *Krieger* court and was actually litigated, and that the court found that demand was not excused, which is both material to, and necessary and essential to, the resulting judgment. I find the Defendants correct in part.

The *Krieger* complaint sought to recover for waste or breach of duty in connection with the entry of an employment agreement with Johnson shortly before the merger, and the discharge of Johnson immediately thereafter, resulting in

---

[152] *See Pyott*, 74 A.3d at 617 n.18 (aggregating cases).
[153] *King v. Grindstaff*, 200 S.E.2d 799, 806 (N.C. 1973); *see Summers*, 528 S.E.2d at 20 (stating test).

millions of dollars of contractual obligation to Johnson. Any cause of action relating to those facts was an asset of Duke, which the *Krieger* plaintiff sought to bring derivatively. The discretion to pursue choses in action, however, resides with the board of directors, and Court of Chancery Rule 23.1 provides that demand must be made on the board before a stockholder has standing to proceed derivatively.[154] Where—as in the *Krieger* Action and the instant case—the stockholder–plaintiff forgoes demand and seeks to proceed with derivative litigation nonetheless, the action will be dismissed unless the plaintiff can demonstrate that demand is futile.[155] The *Krieger* court, addressing Duke's motion to dismiss, considered demand futility under Delaware law. The court noted that under the applicable rule announced in *Aronson v. Lewis*,[156] demand will be excused where particular facts pled raise a reasonable doubt of director independence or disinterestedness, or reasonable doubt that the directors exercised proper business judgement in making the decision challenged.[157] With respect to the first prong, the *Krieger* plaintiff argued that the director defendants were substantially likely to be held liable for breach of duty or waste for "terminating Johnson and paying him a $44 million severance package."[158]

---

[154] *Park Emps.' & Ret. Bd. Emps.' Annuity & Benefit Fund of Chicago v. Smith*, 2016 WL 3223395, at *8 (Del. Ch. May 31, 2016).
[155] *Id.*
[156] 473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).
[157] *Krieger*, 2014 WL 1759054, at *5.
[158] *Id.* (quoting the *Krieger* complaint).

The court found, however, that it could not conclude that "a substantial likelihood of director liability" arose under those facts.[159] Turning to the "business judgement" prong of *Aronson*, the court addressed the plaintiff's argument that the decision to approve a severance payment for Johnson, then fire him, was waste, and by definition outside of business judgement. The court found that plaintiff's waste allegations—arising from the firing of Johnson, resulting in the obligation to pay him millions of dollars severance—"do not provide sufficient basis to doubt that the action [by the defendants] was taken honestly and in good faith."[160] The *Krieger* court accordingly dismissed the complaint under Rule 23.1. To the extent the instant complaint seeks to recover for waste or breach of duty arising from the decisions by the Director Defendants to enter a contract with Johnson, under which discharge would obligate Duke to the payment of millions of dollars in severance—and, shortly thereafter, to fire him[161]—the Plaintiffs' argument that demand is excused with respect to such claims is estopped by the court's decision in *Krieger*. I find that all factors of the North Carolina collateral-estoppel test are satisfied, and that such claims must be dismissed here, for lack of standing under Rule 23.1.

---

[159] *Id.* The *Krieger* court also rejected an argument that failure to follow aspirational employment goals stated in a Duke proxy posed a reasonable likelihood of direct liability. *Id.* at *6.

[160] *Id.* at *8.

[161] *See* Compl. ¶¶ 131, 136.

34

Substantial allegations of the instant complaint do not involve that issue, however. The Plaintiffs here allege that, before the merger, the Director Defendants had reached a conclusion that—despite the contractual obligations of the merger agreement, and despite contrary representations, including to the NCUC—Rogers, and not Johnson, was to be CEO of New Duke. Nonetheless, the Director Defendants concealed this fact, did not correct the now-misleading disclosure to the NCUC, and represented to that body that no facts had changed requiring a further hearing. According to the Complaint, the NCUC approved the merger, presumably in reliance on these misrepresentations, with damages resulting once the facts came out shortly after. According to the Complaint, at least with respect to the failure to correct the misrepresentation to the NCUC, the Director Defendants violated positive law. Thus, argue the Plaintiffs, the actions and inaction of the Director Defendants in this regard were in bad faith, and demand on these Defendants is accordingly excused.

I find that the Plaintiffs here are not collaterally estopped from litigating that issue under the decision in the *Krieger* Action. The issue of demand excusal arising from violation of positive law was not decided by that court. The parties argue whether this bad-faith ground to avoid demand was raised and litigated in *Krieger*.[162]

---

[162] The Defendants argue that directorial bad faith was raised, at least obliquely, in the Complaint. The Plaintiffs assert that, in any event, the defendants argued in the *Krieger* Action that the court should focus only on the allegations of that complaint alleging waste/breach of duty with respect

I need not resolve that issue, because, under North Carolina law, issues are not precluded in subsequent litigation unless "the determination made of those issues in the prior action was necessary and essential *to the resulting judgment*."[163] As I have described above, the *Krieger* court did not address this ground in dismissing the action under Rule 23.1.

Contrasting the claims in the *Krieger* Action and here makes that clear. The waste/breach-of-duty claim in the *Krieger* Action occurred when Johnson was terminated, and New Duke incurred loss or liability thereby. No positive law was implicated by that board action, but common-law duties, allegedly, were violated. In that context, the *Krieger* court evaluated whether the Director Defendants could exercise business judgment in determining whether to pursue that claim. The *Krieger* claim accrued at the time of the firing, on July 2, 2012.[164] With respect to the claim here that the Director Defendants violated positive law, the scenario is different. The gravamen of this portion of Plaintiff's Complaint is that the Director Defendants came to a decision to fire Johnson, but failed to inform the NCUC that prior facts represented to that body were now, accordingly, false; further, they

---

to damages resulting from Johnson's discharge, and that the *Krieger* court's opinion did just that; as a result, the Plaintiffs argue, the defendants should be judicially estopped from arguing that other issues were considered in the *Krieger* Action for purposes of issue preclusion. In light of my decision that collateral estoppel does not apply to the claim of violation of positive law, I need not reach this contention.

[163] *King*, 200 S.E.2d at 806 (emphasis added).

[164] As stated above, to the extent this Complaint seeks to vindicate a similar claim, no matter how much better or persuasive the pleadings, the Plaintiffs are collaterally estopped.

caused Duke to represent positively to the NCUC that no facts had changed. Presumably, that claim accrued when the latter false representation was made, or at least when the NCUC approved the merger in reliance on the false representation. The issue of whether demand is excused in connection with this scenario turns on director bad faith (as discussed below), not on potential liability for waste or breach of duty as formed the decision of the *Kreiger* court. The cases are not "grounded on the same gravamen of the wrong," and the issues presented are not identical.[165]

I note that this is a different situation from recent cases where this Court has found prior dismissals under Rule 23.1 preclusive.[166] Those cases involved complaints with much more persuasive or factually dense pleadings regarding potential underlying liability than in the similar actions previously dismissed. The resulting decisions hold that where an issue was presented, and rejected, by a first court, the issue is precluded before a second tribunal, regardless of the fact that the second complaint may plead facts that make the proposition advanced more likely

---

[165] *Laborers' District Council Constr. Indus. Pension Fund and Hallandale Beach Police Officers and Firefighters' Personnel Ret. Fund v. Bensoussan*, 2016 WL 3407708, at *9 (Del. Ch. June 14, 2016) (quoting Robert L. Haig, *Commercial Litigation in New York State Courts* § 93:3 (4th ed. 4C West's N.Y. Prac. Series 2015).

[166] *See e.g.*, *Bensoussan*, 2016 WL 3407708, at *9; *In re Wal-Mart Stores, Inc. Delaware Derivative Litig.*, 2016 WL 2908344, at *10–11 (Del. Ch. May 13, 2016) (rejecting plaintiffs' attempt to relitigate demand futility on the theory that the "allegations in the Delaware Complaint are more detailed, specific, and extensive than those in the Arkansas Complaint"); *Asbestos Workers Local 42 Pension Fund v. Bammann*, 2015 WL 2455469, at *15–20 (Del. Ch. May 21, 2015) (finding that adding additional or more compelling facts to the same underlying claim does not allow a plaintiff to relitigate demand futility).

or persuasive. While state laws vary on application of issue preclusion, the overarching theory is that efficiency and fairness preclude serial litigation of a single issue. Here, by contrast, although the causes of action arise, in the instant case and in the *Krieger* Action, from facts related to the Duke–Progress merger and the discharge of Johnson, the cause of injury alleged here is discrete from that in the *Krieger* Action, and argument that demand is excused proceeds on unique grounds. In this particular scenario, under North Carolina law, the issues decided there are not identical to those here, and collateral estoppel does not apply to this subset of the Plaintiffs' claims.

The Chancellor's recent decision in *In re Wal-Mart Stores, Inc.*[167] is illustrative by contrast. That case involved Arkansas law, which imposed a test for collateral estoppel similar to the North Carolina test. The issue in the dismissed Arkansas action, considered in *Wal-Mart*, was whether demand would be futile with respect to litigation concerning oversight of the so-called "WalMex bribery," based on allegations of director liability due to knowledge of the bribery cover-up and related actions. "Although certain factual details surface in one complaint and not the other, the core demand futility issue . . . is the same. [Both actions] focus on

---

[167]2016 WL 2908344 (Del. Ch. May 13, 2016).

whether the Demand Board is disabled from deciding whether to initiate litigation . . . in the WalMex bribery scheme and cover-up . . . ."[168]

Similarly, in *Asbestos Workers v. Bammann*,[169] this Court addressed another oversight claim, there asserted against directors who had failed to curb risky trading by a unit of J.P. Morgan Chase & Co. A prior New York action had dismissed a similar action for failure to demonstrate demand futility. The court identified the issue decided in New York thus: "whether a majority of the [c]ompany's directors face a substantial likelihood of personal liability for failure to oversee risk undertaken by the [unit]."[170] The court found the same issue in the Delaware matter precluded, notwithstanding an expanded and more persuasive factual pleading in the Delaware complaint.

By contrast, the allegations in the instant case involve whether the Director Defendants made a conscious decision to mislead regulators in violation of positive law, and are able to evaluate whether to authorize their corporation to pursue damages therefrom. The *Krieger* Action, however, involved whether the defendants could independently consider a waste claim. To my mind, although the replacement of Johnson as CEO underlies both, and unlike the issues in the cases discussed above,

---

[168] *Id.* at *10.
[169] 2015 WL 2455469 (Del. Ch. May 21, 2015).
[170] *Id.* at *17.

39

these are fundamentally different issues.  There is insufficient identity to invoke the doctrine of collateral estoppel.

I note that this decision should not open the door to artful crafting by plaintiffs of new causes of action based on a single factual scenario in an attempt to avoid collateral estoppel.  The interests of efficiency and finality (and, with respect to litigation in different jurisdictions, comity) require a practical view of the issues presented, to preclude such gamesmanship.[171]  This unusual case pushes the limits of such an analysis.

Based on the findings above, I must now evaluate the Defendants' motion to dismiss for failure to make a demand.

*B. The Demand Requirement Under Rule 23.1.*

I have already alluded above to the purposes and requisites of establishing standing in compliance with Rule 23.1.  Briefly, under Delaware law, a corporation's "directors, rather than [its] stockholders, manage the business and affairs of the corporation."[172]  This control extends to a corporation's assets, including its choses in action.  Accordingly, an "individual stockholder intending to bring a suit derivatively on behalf of his corporation [must] first make a demand that the board of directors pursue the cause of action, or demonstrate that the board, as then

---

[171] *See Bensoussan*, 2016 WL 3407708, at *6–9 (discussing limits of issue preclusion).
[172] *Aronson*, 473 A.2d at 811.

40

constituted, would be incapable of acting in the corporate interest, thus excusing demand."[173]

The Plaintiffs here have alleged that making a demand on the New Duke board was futile, and the Company opposes their efforts to pursue this litigation. Therefore, to avoid dismissal under to Rule 23.1, the Plaintiffs' Complaint must "allege with particularity . . . the reasons . . . for not making the effort [to make the litigation demand],"[174] and the Court, in turn, must determine based on those allegations whether the board is able to exercise its business judgment in determining if it is in the corporate interest to pursue the litigation.[175]

The Delaware Supreme Court has established two tests for assessing demand futility, applicable depending on the facts of the case, as set out in *Rales v. Blasband*[176] and *Aronson v. Lewis*; fundamentally, however, both tests address the same question of whether the board can exercise its business judgment on the corporate behalf.[177] The parties agree in briefing that the test articulated in *Aronson*, which applies "when a derivative plaintiff challenges *an earlier board decision*

---

[173] *Park Emps.*, 2016 WL 3223395, at *1.
[174] Ct. Ch. R. 23.1.
[175] *See In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *14 (Del. Ch. May 21, 2013) (following *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006)).
[176] 634 A.2d 927 (Del. 1993).
[177] *Park Emps.*, 2016 WL 3223395, at *8 n.73 (citing *Sandys v. Pincus*, 2016 WL 769999, at *6 (Del. Ch. Feb. 29, 2016)); *China Agritech*, 2013 WL 2181514, at *16 ("The *Aronson* and *Rales* [tests] have been described as complementary versions of the same inquiry.").

made by the same directors who remain in office at the time the suit is filed,"[178] is the proper test to apply under the facts of this case. It is unclear how I can apply *Aronson* here, however. The allegations of the Complaint (to the extent not collaterally estopped) state that the Director Defendants caused Duke to make representations, including to NCUC, that Johnson would be CEO of New Duke. This "decision," if it can be characterized as such, is not alleged to have been wrongful when made. At some point prior to the merger, according to the Complaint, the Director Defendants decided—without a formal meeting—that Johnson was unfit to serve, and that they would install Rogers instead. Again, this is not in itself wrongful. It is failing to correct the now inaccurate former disclosures and representations, and informing the NCUC that "there were no changes justifying reopening the hearings"[179]—knowing nonetheless that Johnson would be removed— that the Plaintiffs allege amounted to bad faith.

Our case law indicates that where *Aronson* is inapplicable, the test in *Rales* applies to the demand-excusal analysis.[180] Because, as a fortuity, *Aronson* was decided before *Rales*, and because *Aronson* was applicable to only a subset of demand-excusal situations, our Supreme Court filled the void—where *Aronson* by its terms was not rationally applicable—with the test in *Rales*. As a matter of

---

[178] *China Agritech*, 2013 WL 2181514, at *15 (emphasis added).
[179] Compl. ¶ 70.
[180] *Rales*, 634 A.2d at 933–35.

doctrine, *Rales* is better thought of as the general test, with *Aronson* indicative of its application in a specific context.[181] The struggle to categorize the board actions and inactions alleged here—as better considered under *Aronson* or under *Rales*—shows, to my mind, the folly of regarding those two analysis as the components of a binary choice.[182] Demand is excused where the particularized facts pled raise a reasonable doubt that the board on which demand would be made could exercise its business judgment on behalf of the company in evaluating the demand. That is the test set out in *Rales*: "whether there is a reason to doubt the impartial[ity] of the directors, who hold the authority under 8 Del. C. section 141(a) to decide [for the corporation] whether to initiate, or refrain from initiating, litigation."[183] I employ that test here, although the outcome would be no different if I employed the second prong of *Aronson*.

Under the business judgment rule, directors may act on behalf of the corporation, free of judicial second-guessing and resulting liability, so long as they act within the constraints of their fiduciary duties. Actions of disinterested directors are presumed under the rule to have been taken in the corporate interest and in good faith, unless that presumption of business judgment is rebutted. This is true with respect to the decision that would have faced the Director Defendants had demand

---

[181] *See Sandys*, 2016 WL 769999, at *11–13 (discussing utility of *Aronson* and *Rales*).
[182] *See id.*
[183] *Id.* at *13 (internal quotations omitted) (alterations in original).

been made, as well as their underlying decisions[184] involved in the demand. A director cannot exercise business judgment, however, where she is asked to authorize litigation in which her prior actions will be scrutinized for liability, *and* where those actions were *not* entitled to the protection of the business judgment rule. Actions taken in bad faith are not entitled to such protection. As a result, "it is generally accepted that a derivative suit may be asserted by an innocent stockholder on behalf of a corporation against corporate fiduciaries who knowingly caused the corporation to commit illegal acts" causing corporate harm.[185] Here, the Plaintiffs argue, with respect at least to the representations by Duke to the NCUC, that the Director Defendants are without business-judgement protection. I agree that, as pled, a reasonable doubt exists that the business-judgment presumption applies, and thus that demand would be futile here.

It is a rare case where directors who are disinterested and independent have acted in a way which deprives them of business-judgement protection; nonetheless, such a case is pled here. The pertinent facts as alleged, supported by reasonable inferences therefrom, are as follows. The Director Defendants caused Old Duke to enter a merger agreement with Progress, a material and negotiated term of which was that the CEO of Progress, Johnson, would serve as CEO of New Duke. The

---

[184] There is no allegation that the independent Director Defendants had any pecuniary interest in the decision to discharge Johnson.

[185] *In re Am. Intl'l Grp., Inc. Consol. Derivative Litig.*, 976 A.2d 872, 889 (Del. Ch. 2009).

44

Director Defendants allowed Duke to disseminate this fact, including via a representation to the NCUC that Johnson would serve as CEO. Permission for the merger from the NCUC, as well as other regulatory bodies, was a condition of the merger. The Director Defendants were aware that, via testimony at a hearing before the NCUC or otherwise, the representation concerning Johnson as CEO was communicated to the NCUC.

During the eighteen-month period in which regulatory approval, and thus the merger itself, was pending, the Director Defendants had second thoughts regarding Johnson. They concluded he was unfit to serve as New Duke CEO. This undoubtedly put the Old Duke board in a bind. At stake was a $13.7 billion merger, of which CEO designation was a material and negotiated term. According to the Director Defendants, they took their responsibilities seriously, hiring counsel to represent them as they considered their alternatives.[186] Those alternatives, I assume, included an attempt to renegotiate or avoid the merger—risking loss of merger benefits and liability for a break-up fee—and accepting the unfit Johnson as CEO, among perhaps other unpalatable paths available. Ultimately, the Complaint alleges that the Director Defendants made a decision to replace Johnson with their own

---

[186] The Director Defendants cite to a matter outside the Complaint, an affidavit filed by Ann Gray with the NCUC as part of the hearings investigating the alleged misrepresentations to that body. The parties hotly dispute whether and to what extent evidence presented in that proceeding can be relied on here, but I do not find it necessary to my decision in any event.

CEO, Rogers. To minimize the risk of that decision on the merger itself, the Director Defendants did not announce their decision to Progress or to the public. They did not amend their proxy statements,[187] nor did they inform the regulatory bodies whose approval was a requisite to the merger. They met with Johnson and negotiated an employment agreement, presumably to conceal the fact that he would not be employed post-closing, while at the same time ensuring that Rogers was willing to serve as CEO. Once the merger was consummated, the New Duke board, controlled by the Director Defendants, met and officially appointed Johnson as CEO, as required by the letter of the merger agreement. Immediately thereafter, Gray called the meeting into executive session, and Johnson was instructed to remain available. For the first time, the legacy Progress directors, who composed a minority of the New Duke board, were told that Johnson was unacceptable to the Director Defendants. They reacted with shock. An hour or more of discussion ensued, during which the legacy Progress directors attempted to make the case for Johnson as CEO. The Director Defendants, according to the Complaint, did not participate, and the only reason given for Johnson's discharge was that he was not a "good fit." Ultimately, the New Duke board voted, strictly along legacy lines, to discharge

---

[187] It is an oddity of this case, involving a merger of two utilities, that the stockholders of both companies approved the merger on August 23, 2011, but that closing, reliant as it was on regulatory approval, did not take place until July 2, 2012. In other words, the decision by the Director Defendants to employ Rogers and not Johnson as CEO was made *after* the stockholders vote, and the proxies were not misleading as of that time.

46

Johnson. Within an hour of the meeting, Gray met Johnson at Duke headquarters to advise Johnson of the board's decision and demand his resignation. Johnson's resulting resignation took effect at one minute past midnight.

The merger could not proceed without permission from, among others, the FERC and the NCUC. The NCUC deferred action until the FERC agreed to the merger. By the time that permission was forthcoming, the "walk-away" date—after which the merger could terminate—was fast approaching. After the FERC agreed to the merger, in light of the exigencies of time, Duke requested expedited action from the NCUC. On the eve of the merger, it represented that "there [had been] no changes justifying reopening the hearings" following the initial public hearings, which closed on September 22, 2011; the company did not otherwise disclose the Director Defendants' decision to replace Johnson with Rogers as CEO.[188] The NCUC gave permission for the merger, which then closed.

By North Carolina statute, entitled "Furnishing false information to the [North Carolina Utility] Commission; withholding information from the Commission":

> (a) Every person, firm or corporation operating under the jurisdiction of the Utilities Commission or who is required by law to file reports with the Commission who shall *knowingly or willfully file or give false information* to the Utilities Commission *in any report, reply, response, or other statement or document* furnished to the Commission shall be guilty of a Class 1 misdemeanor.

---

[188] Compl. ¶¶ 69–70.

(b) Every person, firm, or corporation operating under the jurisdiction of the Utilities Commission or who is required by law to file reports with the Commission *who shall willfully withhold clearly specified and reasonably obtainable information from the Commission in any report, response, reply or statement filed with the Commission* in the performance of the duties of the Commission or who shall fail or refuse to file any report, response, reply or statement required by the Commission in the performance of the duties of the Commission shall be guilty of a Class 1 misdemeanor.[189]

After the substitution of Rogers for Johnson was made public, shortly after the merger, the NCUC, believing itself traduced, commenced hearings into the representations at issue here. The North Carolina Attorney General also began an investigation. Damages, reputational and financial, allegedly resulted.

Directors in Delaware corporations are presumed to act in good faith, for the benefit of their corporation. It is never good faith, however, to knowingly cause a Delaware corporation to violate positive law.[190] "Although directors have wide authority to take lawful action on behalf of the corporation . . . . Delaware corporate law has long been clear on this rather obvious notion; . . . it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully."[191] The particularized allegations here, together with the reasonable inferences therefrom, if true, raise a reasonable probability that Duke violated the law, and thus demonstrate bad faith. Energy utilities are heavily regulated concerns,

---

[189] N.C. Gen. Stat. Ann. § 62-326 (emphasis added).
[190] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66–67 (Del. 2006).
[191] *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007).

as illustrated by the fact that this merger required approval of both federal (FERC) and state (among others, NCUC) regulatory bodies. It is a reasonable inference that the Director Defendants knew that the NCUC would consider the identity of the initial chief executive of the combined entity material to its decision, as its subsequent reaction to being misled demonstrates. The Director Defendants knew that Duke had represented that that person would be Johnson.

The Complaint alleges that, before the merger, the Director Defendants had decided to discharge Johnson, and thus knew that the uncorrected representation concerning the CEO (and the representation that "there were no changes justifying reopening the hearings")[192] to the NCUC were false, and in violation of positive law, including Section 62-326 quoted above. The Director Defendants argue that this pleading is merely conclusory, and suggest that they had not decided to strong-arm the New Duke board into firing Johnson. Instead, they genuinely desired the input of their fellow directors—the Progress legacy directors—before making this decision. Of course, if that is true, it would have been wise to give those directors some indication that this subject would be broached, rather than blind-siding them as actually occurred.[193] At any rate, this is a motion to dismiss. It is entirely possible

---

[192] Compl. ¶ 70.

[193] To the extent that the Plaintiffs attempt to argue that the Director Defendants acted with bad faith based on lack of notice to the legacy Progress directors that the CEO issue would be raised at the first New Duke board meeting, that cause of action is not sufficiently alleged in the Complaint, and I do not consider it here.

that, upon a developed record, the true actions of the Defendants will be vindicated. The pleadings are sufficient, at this stage, however, to support the inference that the Director Defendants' decision had been made well before the merger closed. Members of the Old Duke board had contacted Rogers to ensure that he was willing to serve as CEO. As mentioned, the legacy Progress directors were given no opportunity to prepare information supportive of Johnson. Tellingly, the Director Defendants offered no explanation—beyond expressing that Johnson was a "bad fit"—and offered no persuasion during the executive session, then voted unanimously to discharge Johnson.

Finding at this pleading stage, based on facts pled and reasonable inferences, that the Director Defendants knew a material representation to the NCUC was false at the time that body approved the merger, it is reasonably conceivable that the Director Defendants each caused Duke to violate Section 62-326.[194] If so, and corporate damages resulted, the Director Defendants would be liable: "In short, by consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused."[195] Such bad-faith acts, if they took place, strip each Director Defendant of the presumption that he acted with proper business judgement. If so, the burden will

---

[194] N.C. Gen. Stat. Ann. § 62-326.
[195] *Desimone*, 924 A.2d at 934.

fall on the Director Defendants to justify their actions; in such a situation, there is reason to doubt the impartiality of the Defendants in evaluating any demand seeking to impose liability for those actions, and demand is excused under *Rales*.[196]

*B. The Defendants Motion to Dismiss Under Rule 12(b)(6).*

Given my decision above, and in light of the broad allegations of the Complaint, I find it efficient to defer action on this motion, pending conference of counsel regarding what causes of action remain, and whether further consideration under Rules 12(b)(6) and 23.1 is required.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for lack of standing is GRANTED in part and DENIED in part. A decision on the Defendants' motion to dismiss for failure to state a claim is deferred pending further consultation with counsel. An omnibus final order on these outstanding motions will await further proceedings.

---

[196] Alternatively, under *Aronson*, I find the Plaintiffs have pled particularized facts sufficient to create a reasonable doubt that the underlying transaction was the product of a valid exercise of business judgment.

51